# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MINIDOKA IRRIGATION DISTRICT,
*Plaintiff-Appellant,*

v.

DEPARTMENT OF INTERIOR, of the
United States; GALE A. NORTON,
Secretary of the Interior; JOHN W.
KEYS, III, Commissioner of
Reclamation; J. WILLIAM
MCDONALD,* Regional Director of
Reclamation,
*Defendants-Appellees.*

No. 03-35697

D.C. No.
CV-91-00529-BLW

ORDER
AMENDING
OPINION AND
DENYING
PETITION FOR
REHEARING
EN BANC AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Idaho
B. Lynn Winmill, District Judge, Presiding

Argued and Submitted
February 16, 2005—Seattle, Washington

Filed April 15, 2005
Amended July 6, 2005

Before: Betty B. Fletcher, M. Margaret McKeown, and
Ronald M. Gould, Circuit Judges.

*Pursuant to Fed. R. App. P. 43(c)(2), Gale A. Norton is substituted for
her predecessor, Manuel Lujan, as Secretary of the Interior; John W. Keys,
III is substituted for his predecessor, Dennis Underwood, as Commis-
sioner of Reclamation; and J. William McDonald is substituted for his pre-
decessor, John W. Keys, III, as Regional Director of Reclamation.

7813

Opinion by Judge Gould

## COUNSEL

Beverly J. Singleman, Hubert & Hernandez, P.A., Las Cruces, New Mexico, for the appellant.

Thomas E. Moss, United States Attorney for the District of Idaho, and Robert C. Grisham, Assistant United States Attorney, Boise, Idaho, for the appellees.

## ORDER

(1)   Our opinion filed on April 15, 2005, and published at 406 F.3d 567, is AMENDED as follows:

We revoke the content of Footnote 1 in its entirety and substitute the following language in its place:

> MID also asserted in its briefing on appeal that it has a vested statutory right to credits under federal reclamation law. At oral argument, MID's counsel conceded that the government's obligations to MID under federal reclamation law were the same as its obligations under the contract and that MID's statutory claim is subject to the same six-year statute of limitations as its breach of contract claim. Because the statutes of limitations on both claims were trig-

gered by the same event—the government's unequivocal repudiation of its obligation to give MID annual accountings and credits—we treat both claims as one and dispose of them together under our analysis of whether the government repudiated the contract. *See Pisciotta v. Teledyne Indus., Inc.*, 91 F.3d 1326, 1332 (9th Cir. 1996) (holding that the statute of limitations on employees' ERISA claim began running the first time employer violated the statute by freezing employees' reimbursement amounts, notwithstanding employees' assertion that their claims were not time-barred under a continuing violation theory because a new and separate breach of ERISA arose each time they were entitled to a reimbursement payment).

(2)  Judges McKeown and Gould have voted to deny Appellant's Petition for Rehearing En Banc, and Judge B. Fletcher so recommends.

The full court has been advised of Appellant's Petition for Rehearing En Banc and no judge of the court has requested a vote on the Petition for Rehearing En Banc. Fed. R. App. P. 35.

The Petition for Rehearing En Banc is DENIED.

No further petitions for rehearing or rehearing en banc will be accepted.

---

**OPINION**

GOULD, Circuit Judge:

The Minidoka Irrigation District ("MID") sued the federal government alleging, *inter alia*, that the government had

breached its contract to credit MID with profits derived from the operation of the Minidoka Project power plant. On remand from our Court in *Minidoka Irrigation District v. DOI*, 154 F.3d 924 (9th Cir. 1998) ("*Minidoka I*"), the district court held a bench trial and returned judgment in favor of the government, ruling that MID's contract claim is barred by the six-year statute of limitations in 28 U.S.C. § 2401(a). MID appeals the district court's judgment for the government, arguing that: (1) repudiation cannot trigger the statute of limitations on a continuing contract; (2) the government's repudiation was anticipatory and could not trigger the statute of limitations; and (3) the district court erred in finding that the Bureau of Reclamation ("Bureau") had unequivocally repudiated the contract by March of 1985.[1] We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

# I

"The Minidoka Project is an irrigation project constructed by the [Bureau] under the Reclamation Act of 1902." *Minidoka I*, 154 F.3d at 925. The Burley Irrigation District ("Burley") and MID are the two irrigation districts located in

---

[1]MID also asserted in its briefing on appeal that it has a vested statutory right to credits under federal reclamation law. At oral argument, MID's counsel conceded that the government's obligations to MID under federal reclamation law were the same as its obligations under the contract and that MID's statutory claim is subject to the same six-year statute of limitations as its breach of contract claim. Because the statutes of limitations on both claims were triggered by the same event—the government's unequivocal repudiation of its obligation to give MID annual accountings and credits—we treat both claims as one and dispose of them together under our analysis of whether the government repudiated the contract. *See Pisciotta v. Teledyne Indus., Inc.*, 91 F.3d 1326, 1332 (9th Cir. 1996) (holding that the statute of limitations on employees' ERISA claim began running the first time employer violated the statute by freezing employees' reimbursement amounts, notwithstanding employees' assertion that their claims were not time-barred under a continuing violation theory because a new and separate breach of ERISA arose each time they were entitled to a reimbursement payment).

the Minidoka Project region. *Id.* Under Section 4 of the Reclamation Act,[2] the users of the water from the Minidoka Project were required to repay the construction costs of the project. *See United States v. Tulare Lake Canal Co.*, 535 F.2d 1093, 1126 n.127 (9th Cir. 1976) ("Section 4 of the Reclamation Act of 1902, 32 Stat. 389, 43 U.S.C. § 461, required the Secretary to establish construction charges for individual tracts [on land irrigated by the irrigation projects] with a view of returning the entire estimated cost of construction to the reclamation fund.").

The Town Sites and Power Development Act of 1906 granted the Secretary of the Interior ("Secretary") the discretion to sell power produced by power plants on reclamation projects in excess of that required for irrigation purposes, and to lease the power privilege (the right to use the falling water created by the project dams to produce power). 43 U.S.C. § 522.[3]

---

[2]Section 4 of the original Reclamation Act of 1902 provides in pertinent part:

> That upon the determination by the Secretary of the Interior that any irrigation project is practicable, he may cause to be let contracts for the construction of the same, . . . providing the necessary funds for such [construction] are available in the reclamation fund, and thereupon he shall give public notice of the lands irrigable under such project, and limit of area per entry . . . ; also of the charges which shall be made per acre upon the said entries, and upon lands in private ownership which may be irrigated by the waters of the said irrigation project, and the number of annual installments, not exceeding ten, in which such charges shall be paid and the time when such payments shall commence. The said charges shall be determined with a view of returning to the reclamation fund the estimated cost of construction of the project, and shall be apportioned equitably . . . .

Reclamation Act, ch. 1093, § 4, 32 Stat. 389 (1902) (current version as amended at 43 U.S.C. §§ 419, 461 (2000)).

[3]43 U.S.C. § 522 provides in pertinent part that:

> Whenever a development of power is necessary for the irrigation of lands, under any project undertaken under the said reclamation

Any profits derived from such sales or leases would be credited to the project from which the surplus power or power privilege was derived. Congress then passed the Warren Act of 1911, 43 U.S.C. §§ 523-25, authorizing the Secretary to sell surplus water to non-project irrigators and to contract with private irrigation companies for water delivery. The Fact Finders Act of 1924 was later enacted in order to specify the manner in which profits from such contracts were to be credited.[4]

---

Act, or an opportunity is afforded for the development of power under any such project, the Secretary of the Interior is authorized to lease for a period not exceeding ten years, giving preference to municipal purposes, any surplus power or power privilege, and the moneys derived from such leases shall be covered into the reclamation fund and be placed to the credit of the project from which such power is derived . . . .

[4]Subsection I of the Fact Finders Act provides in pertinent part that:

Whenever the water users take over the care, operation, and maintenance of a project, or a division of a project, the total accumulated net profits, as determined by the Secretary, derived from the operation of project power plants . . . shall be credited to the construction charge of the project, or a division thereof, and thereafter the net profits from such sources may be used by the water users to be credited annually, first, on account of project construction charge, second, on account of project operation and maintenance charge, and third, as the water users may direct. No distribution to individual water users shall be made out of any such profits before all obligations to the Government shall have been fully paid.

43 U.S.C. § 501.

Subsection J of the Fact Finders Act provides:

All moneys or profits as determined by the Secretary heretofore or hereafter derived from the sale or rental of surplus water under the Warren Act . . . or from the connection of a new project with an existing project shall be credited to the project or division of the project to which the construction cost has been charged.

43 U.S.C. § 526.

MID took over the operation and maintenance of the Minidoka Project's Gravity Unit[5] in 1916, leaving the Bureau in charge of maintaining and operating the rest of the project works. In 1927, MID and Burley entered into separate agreements with the Bureau to confirm that the Secretary would determine and announce the profits to be credited to the irrigation districts in the manner outlined by the Fact Finders Act. For decades, the arrangements between the federal government and MID and Burley appear to have operated in a satisfactory way for all concerned so far as we can glean from the record.

In 1962, due to steadily declining net profits and rising operation costs, Burley entered into an amendatory contract with the Bureau. Under the terms of the contract, Burley gave up its claim to profits in return for the government's agreement to relieve Burley from its obligation of repaying construction costs associated with the Minidoka Project and to supply Burley with power at a discounted rate. MID, however, declined to amend its contract.

In 1963, the Secretary transferred the authority to market surplus power from the Minidoka Project from the Bureau to the Bonneville Power Administration ("BPA"). After this transfer of marketing authority, the Bureau and MID again discussed the possibility of an amendatory contract. The Bureau informed MID that the Minidoka Project would no longer generate profits because the Bureau would only receive enough income from the BPA to cover the project's costs. Despite being told that there would be no future profits, MID refused to amend its contract.

---

[5]The Gravity Unit distributes water diverted from the Minidoka Dam to MID, and is comprised of an eight-mile long canal and lateral system. United States Dep't of the Interior, Bureau of Reclamation, Minidoka Project, Idaho: General Description & Plan, *available at* http://www.usbr.gov/dataweb/html/minidoka.html (last visited March 21, 2005).

At the crux of the current dispute are several letters that MID and the Bureau exchanged over the next few decades. Therein MID asserted that it was entitled to profits from the power generated by the Minidoka Project, and the Bureau responded by reiterating that rising costs and the transfer of marketing authority to the BPA precluded the possibility of any such profits. The Bureau also continued to press MID to amend its contract, but to no avail.

MID finally brought suit against the federal government on December 10, 1991, alleging, *inter alia*, that the Bureau and various government officials had violated both "Reclamation law and the terms of the [1927] contract" by failing to account to and credit MID for profits derived from the Minidoka Dam. "The district court found that the United States repudiated its contract with MID as early as 1963 and no later than 1985," and granted the government's motion for summary judgment on the ground that the six-year statute of limitations in 28 U.S.C. § 2401(a)[6] had run. *Minidoka I*, 154 F.3d at 925. We then reversed and remanded for a trial, holding that "[v]iewing the evidence in the light most favorable to MID, a genuine issue of material fact has been raised whether the United States repudiated its contract with MID." *Id.* at 929.

On remand, the district court held a seven-day bench trial and once again held that MID's breach of contract claim was barred by the statute of limitations because it found that the United States had repudiated its contract with MID "as early as 1966, but at least by March 1985." This timely appeal followed.

---

[6]Under 28 U.S.C. § 2401(a), "[e]xcept as provided by the Contract Disputes Act of 1978, every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues."

## II

"We review *de novo* the question whether a claim is barred by the statute of limitations." *Cashman v. City of Cotati*, 374 F.3d 887, 892 (9th Cir. 2004). "We also review de novo the question when the statute of limitations begins to run." *Id.* "In the Ninth Circuit, the question whether a party has repudiated is one of fact." *Minidoka I*, 154 F.3d at 927. Thus, we review the district court's determination that the Bureau "unconditionally, unequivocally, and positively repudiated any obligation that it may have had under the 1927 Contract" with MID "at least by March 1985," for clear error. *See Chevron USA, Inc. v. Bronster*, 363 F.3d 846, 855 (9th Cir. 2004) ("We review the district court's findings of fact for clear error."). Review under the clearly erroneous standard is "significantly deferential, requiring a 'definite and firm conviction that a mistake has been committed.' " *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 623 (1993). "So long as the district court's view of the evidence is plausible in light of the record viewed in its entirety, it cannot be clearly erroneous, even if the reviewing court would have weighed the evidence differently had it sat as the trier of fact." *SEC v. Rubera*, 350 F.3d 1084, 1093-94 (9th Cir. 2003). In other words, if "there are two permissible views of the evidence, the [district court's] choice between them cannot be clearly erroneous." *United States v. Elliott*, 322 F.3d 710, 715 (9th Cir. 2003). Furthermore, in reviewing district court findings of fact for clear error, we "must view the evidence in the light most favorable to the prevailing party." *Rubera*, 350 F.3d at 1094.

## III

MID maintains that the district court erred in ruling that the statute of limitations barred this suit, arguing that "[a] statute of limitations does not run against continuing violations . . . which occur during the limitations period." MID also characterizes the government's conduct in this case as "anticipatory

repudiation" and "anticipatory breach" instead of actual repudiation and breach, and argues that the statute of limitations does not begin running with an anticipatory repudiation until the time for performance comes due, unless the nonbreaching party elects to treat the anticipatory repudiation as a final breach and bring suit earlier. However, as the district court and the government point out, these legal arguments are precluded by the law of the case.

In *Minidoka I*, an earlier panel of this Court declined MID's invitation to apply the continuing breach theory to MID's contract claim, concluding that the only remaining question on this claim was whether the United States had totally repudiated the 1927 contract with MID more than six years prior to December 10, 1991, when the instant action was filed. 154 F.3d at 926. In so holding, the panel stated that, "[a] contract that creates continuing obligations 'is capable of a series of partial breaches or a single total breach by repudiation.' " *Id.* (quoting *Trs. for Alaska Laborers-Constr. Ind. Health & Sec. Fund v. Ferrell*, 812 F.2d 512, 517 (9th Cir. 1987)). The panel explained that "[l]anguage that is accompanied by a breach by non-performance may amount to a repudiation even though, standing alone, it would not be sufficiently positive." *Id.* at 927 (quoting Restatement (Second) of Contracts § 250 cmt. b).

[1] *Minidoka I* is the law of the case. "Under the 'law of the case' doctrine, a court is ordinarily precluded from reexamining an issue previously decided by the same court, or a higher court, in the same case." *Old Person v. Brown*, 312 F.3d 1036, 1039 (9th Cir. 2002). As we held in *Old Person*, the law of the case doctrine is subject to three exceptions that may arise when "(1) the decision is clearly erroneous and its enforcement would work a manifest injustice, (2) intervening controlling authority makes reconsideration appropriate, or (3) substantially different evidence was adduced at a subsequent trial." *Id.* None of these exceptions apply here.

**[2]** MID cannot avail itself of the first exception to the law of the case doctrine because the earlier panel's determination that a total repudiation can trigger the statute of limitations on a continuing contract was not clearly erroneous. *Minidoka I*, 154 F.3d at 926. The panel in *Minidoka I* relied on our Circuit's decision in *Trustees for Alaska*, which held that contracts requiring "continuing performance" are "capable of . . . a single total breach by repudiation." 812 F.2d at 517. The *Minidoka I* decision is supported by the leading treatises. *See* 4 A. Corbin, Corbin on Contracts ("Corbin") § 956 (1951) (noting that continuing contracts "are capable of . . . a single total breach by repudiation" and that there are cases where "the breach is such that the plaintiff must treat it as 'total' and sue once and for all"); *id.* at § 989 (noting that where there is "actual present breach . . . accompanied by definite repudiation . . . according to the weight of authority there is a total breach by the repudiator, creating in the injured party a single right of action"); Restatement (Second) of Contracts § 243(2) (1981) ("[A] breach by non-performance accompanied or followed by a repudiation gives rise to a claim for damages for total breach.").

MID argues at length that an anticipatory repudiation cannot trigger the statute of limitations in a contract action. This, however, is beside the point because the government's repudiation here was not merely anticipatory, rather it was a total repudiation accompanied by the government's breach of its obligation to provide MID with annual accountings and credits based on revenues from the Minidoka Project.

**[3]** The second exception to the law of the case doctrine does not apply because there has been no change in the controlling authorities since *Minidoka I* was decided. MID's reliance on the Supreme Court's decision in *Franconia Associates v. United States*, 536 U.S. 129 (2002), is misplaced. In *Franconia*, the petitioners were property owners who received low-interest mortgage loans from the federal government in exchange for agreeing to devote their proper-

ties to low-income housing and to abide by related restrictions during the life of the loans. The promissory notes executed by the petitioners contained provisions allowing them to obtain release from the property use restrictions by prepaying the loans "at any time at the option of Borrower." *Id.* at 135. Later Congress enacted a statute permanently restricting pre-payment of the loans, and the petitioners brought suit alleging that the restriction amounted to a taking of their property in violation of the Fifth Amendment. The government responded that the cause of action for breach of the loan agreement accrued when the statute was enacted and that the petitioners' suits were therefore barred by the applicable statute of limitations.

The Supreme Court characterized the government's performance obligation under the promissory notes as "an obligation to accept prepayment" from the petitioners who enjoyed the right to prepay "at any time," which meant that the government's performance could only become due "when, at some point in the future, petitioners attempted to prepay." *Id.* at 142-43. Thus, the Court held that the statute passed by Congress could amount only to an anticipatory[7] repudiation of the loan agreements, not an immediate breach, and could not unilaterally cause the limitations period to begin running. *Id.*

**[4]** Here, by contrast, the government's obligation under the 1927 contract is to credit MID annually with a share of the profits generated by the Minidoka Project, and it is clear the government has not performed this obligation since the BPA assumed control over the sale of surplus power from the Mini-

---

[7]The Supreme Court's *Franconia* opinion speaks in terms of repudiation not "anticipatory" repudiation. However, it is clear from the Court's reasoning that it is discussing anticipatory repudiation in particular when it talks about a "promisor's renunciation of a 'contractual duty *before* the time fixed in the contract for . . . performance' " is due, while citing to authorities that are devoted to anticipatory repudiation, such as Corbin § 959, which is entitled "Anticipatory Breach of Contract." *Franconia*, 536 U.S. at 143.

doka Project in 1963. This case involving active breach by nonperformance, coupled with the district court's finding of unequivocal repudiation, is readily distinguishable from *Franconia* where there was only anticipatory repudiation because the government was incapable of breaching its duty to accept prepayment until the petitioners caused the duty to arise by attempting to tender such prepayment. We therefore conclude that *Minidoka I*'s holding that actual repudiation can cause the statute of limitations on a continuing contract to run is still good law, and has not been undermined by *Franconia*.

**[5]** The third exception to the law of the case doctrine is also inapplicable. The district court's Memorandum Decision and Order does not analyze any evidence apart from that already presented at the summary judgment phase, and an independent review of the trial transcript shows that no evidence of a "substantially different" nature was adduced at trial on the issue of repudiation, although MID did introduce a greater quantum of evidence to emphasize the alleged ambiguities in the government's statements of repudiation.

**[6]** Accordingly, we are "bound by the opinion of the prior panel as the law of the case. Also we have no discretion to depart from precedential aspects of our prior decision in [*Minidoka I*], under the general law-of-the circuit rule." *Old Person*, 312 F.3d at 1039 (citing *Ross Island Sand & Gravel v. Matson*, 226 F.3d 1015, 1018 (9th Cir. 2000), for the proposition that if a case "remains the law of the circuit . . . we are without authority to overrule its directives").

## IV

MID contends that the district court's finding that the Bureau had repudiated its contract with MID by March of 1985 was erroneous as a matter of law because it was based only on the "evidence previously raised and rejected by this Court in its 1998 opinion." MID is essentially arguing that because the *Minidoka I* panel held that the government's let-

ters and conduct between 1966 and 1985 were insufficient to support a grant of summary judgment for the government on the ground that it repudiated the contract before 1985, we are bound to find that the same evidence is insufficient to support the district court's post-trial factual finding that such a repudiation occurred.

**[7]** The panel in *Minidoka I* reversed the district court's grant of summary judgment, stating that when "viewing the evidence in the light most favorable to MID," the evidence "falls short of unequivocal repudiation" and "could lead" to the belief that the government was not breaching the contract. 154 F.3d at 927-28. However, that the *Minidoka I* panel reversed the district court's grant of summary judgment for the government does not preclude the district court from entering judgment for the government again after a bench trial, even if the district court considers no additional evidence aside from that which was already before it at the summary judgment phase. *See Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999) (en banc).

In *Kearney*, an action for disability benefits brought under ERISA, we reversed the district court's grant of summary judgment for the defendant plan administrator and remanded for a bench trial, notwithstanding that the trial might consist of nothing more than "the district judge . . . read[ing] exactly what he has already read [at the summary judgment phase], which did not persuade him that [the plaintiff] could establish even a genuine issue of fact." *Id.* We explained that a remand for trial was necessary "even if [the trial would] consist[ ] of no more than the trial judge rereading what he ha[d] already read" because the trial judge would review the evidence under a different standard at the trial phase than he had at summary judgment:

> The district judge will be asking a different question as he reads the evidence, not whether there is a genuine issue of material fact, but instead whether [the

plaintiff has proven his claim]. In a trial on the record, but not on summary judgment, the judge can evaluate the persuasiveness of conflicting testimony and decide which is more likely true. The difference in the questions he is asking of the material may lead the judge to read it differently. . . . There is no such thing as findings of fact, on a summary judgment motion. But in a bench trial on the record, the judge will have to make findings of fact under Federal Rule of Civil Procedure 52(a). The process of finding the facts "specially," as that rule requires, sometimes leads a judge to a different conclusion from the one he would reach on a more holistic approach.

*Id.* (internal citations, quotation marks, and alterations omitted). We also noted that a trial would change the standard of appellate review "from de novo review of summary judgment, to clearly erroneous review of findings of fact" and that such a "change could be outcome determinative." *Id.*

Under *Kearney*, there is no inconsistency between the *Minidoka I* decision reversing the district court's grant of summary judgment on the ground that there was an issue of fact as to repudiation, and our now affirming the district court's entry of judgment for the government based on the district court's post-trial finding that the government had repudiated its contract with MID before 1985. This is so even though it is undisputed[8] that the district court relied only on the same evidence it had considered at the summary judgment phase. At trial the district court evaluated the evidence to determine which party's position was "more likely true," instead of looking at it in the light most favorable to MID as the nonmovant at the summary judgment stage. *Id.*

---

[8]As noted above, the district court's Memorandum Decision and Order does not analyze any other evidence, and the government does not dispute MID's contention that the district court's finding of unequivocal repudiation was based on "the very same documentary evidence and legislation relied on by the district court in its earlier summary judgment."

Similarly, now that the district court has conducted a full bench trial and made an actual finding of fact, our review on appeal will only be for clear error and we will affirm the district court as long as its finding is plausible in light of the record viewed in its entirety, instead of reviewing the evidence de novo and drawing all inferences in favor of MID, as the *Minidoka I* panel was required to do. *See id.*

**[8]** Evaluating the government's letters and conduct between 1963 and 1985 in light of the legal principles on repudiation set forth by *Minidoka I* and quoted above, we are satisfied that the district court did not clearly err in concluding that the government had repudiated its 1927 contract with MID by no later than March 1985. The district court first found that MID was on notice that it would no longer receive credits from the Minidoka power plant in 1963 when the BPA assumed responsibility for marketing surplus power generated from the power plant. The district court's finding was based on its interpretation of the 1963 secretarial order that implemented this transfer, which stated that the BPA, "shall interconnect and coordinate the Federally-owned power generation and transmission facilities in the Snake River Basin with those in the rest of the Columbia River Basin in order to extend the benefits of uniform rate schedules and integrated power services to all parts of [its] marketing area." Indeed, the *Minidoka I* panel acknowledged that it is plausible to view the action described in this order as repudiation by conduct on the government's part because this language "could be understood as notifying MID that the BPA will spread costs across power generators, eliminating profits from the MID project." 154 F.3d at 928.

The district court then found that the Bureau's 1966 letter constituted "unequivocal repudiation." The 1966 letter stated in pertinent part that the transfer of power marketing authority to BPA "preclude[s] the possibility of having any net power revenues from the operation of Minidoka Dam as an isolated plant." The district court's reading of this language as a clear

statement that MID will no longer receive credits from the Minidoka power plant is supported by the *Minidoka I* panel's observation that "[t]his statement [in the 1966 letter] could be interpreted as repudiation." 154 F.3d at 927.

The district court further found that the Bureau's 1968 letter "was simply a reiteration of the 1966 letter's explanation and repudiation,"[9] and that the 1985 letter[10] "once again clearly and unambiguously repudiated any duty [the Bureau] may have had under the 1927 contract." As noted by the *Minidoka I* panel, because the Bureau's "subsequent letters are similar to the 1966 letter," 154 F.3d at 928, it follows that if it is plausible to interpret the 1966 letter as one of repudiation, it is equally plausible to interpret the later similar letters as statements of repudiation as well.

[9] MID argues that the government's failure to credit MID "may not have been a breach of contract or failure to perform under the contract, if indeed there were no 'net revenues' during those years" because the government was only required to give credits when there were profits. MID also asserts that the government's offers to provide MID with accountings are inconsistent with repudiation. However, even if the record could also plausibly support MID's alternate interpretation, where "there are two permissible views of the evidence, the [district court's] choice between them cannot be clearly erroneous." *Elliott*, 322 F.3d at 715. The district court's finding of repudiation must stand.

---

[9]The Bureau's 1968 letter was substantially similar to its 1966 letter and provided in pertinent part that "there could be no net revenues available in the future by reason of the requirement for new investment to cover replacements and improvements."

[10]The Bureau's 1985 letter again explained that "there have been no profits accruing to the Minidoka Powerplant since 1962" when the BPA assumed responsibility for marketing the Minidoka Project's surplus energy.

**V**

We conclude that the district court did not clearly err in finding that the government had repudiated its contract with MID by March 1985, and we affirm the district court's ruling that MID's contractual claim is barred by the statute of limitations in 28 U.S.C. § 2401(a).

**AFFIRMED.**