**EASTBANC, INC., Appellant,**

v.

**GEORGETOWN PARK ASSOCIATES II, L.P., et al., Appellees.**

No. 06–CV–1092.

District of Columbia Court of Appeals.

Argued Sept. 19, 2007.
Decided Jan. 17, 2008.

Seth P. Waxman, with whom Paul R.Q. Wolfson, Andrew R. Varcoe, Jennifer Mueller, Peter J. McNulty, Catherine M.A. Carroll, Stephen Bogorad, Martin J. Jaron, Jr., and Leo G. Rydzewski were on the brief, Washington, for appellant.

S. Scott Morrison, with whom Nicole Lynn Kobrine and Michael J. Klyce, Jr., were on the brief, for appellees.

Before FARRELL, REID, and FISHER, Associate Judges.

FISHER, Associate Judge:

In 1998, real estate developers Georgetown Park Associates II and Herbert Miller (appellees) agreed to use a Right of First Offer, controlled by Mr. Miller, to help fellow developer EastBanc (appellant) acquire the Georgetown Park Mall. The parties made various efforts over the years, and they executed a new, temporary agreement in 2001, but EastBanc did not acquire the property. In 2006, Mr. Miller informed EastBanc that he intended to exercise the Right of First Offer for his own benefit. EastBanc sued, alleging breach of the 1998 agreement, but the Superior Court ruled that the statute of limitations barred the complaint. We hold that the signing of the 2001 agreement did not start the running of the limitations period. Accordingly, we reverse and remand for further proceedings.

## I. Factual and Procedural Background

### A. The Parties, the Property, and the ROFO

Anthony Lanier is president of EastBanc, Inc., a corporation that has been developing commercial real estate in Georgetown since 1996. Herbert S. Miller is the sole general partner of Georgetown Park Associates II Limited Partnership ("GPA II"). Acting on behalf of EastBanc, Mr. Lanier decided that he wanted to buy the Georgetown Park Mall ("the Mall" or "the Property"), which was owned by Georgetown Park Associates ("GPA"). However, in an earlier transaction with GPA, Mr. Miller and GPA II had acquired a Right of First Offer ("ROFO") for the Mall. Similar in many ways to a right of first refusal, a ROFO affords the holder an opportunity to purchase property before it is sold to a third party. Thus, in order to

acquire the Mall, Mr. Lanier had to contend with the ROFO, which GPA II owned.

### B. The 1998 Letter Agreement and Its Aftermath

In April 1998, Mr. Miller and Mr. Lanier reached an oral agreement which was memorialized in a letter dated April 22, 1998 (the "1998 Letter Agreement"). Signed by both Mr. Miller and Mr. Lanier, the letter "confirm[ed]" the parties' agreement "concerning a joint venture to acquire and redevelop the Georgetown Park property." In this document, Mr. Miller reiterated his oral agreement with Mr. Lanier: "I would cooperate with you in exercising my voting rights with respect to the Right of First Offer in a manner that would facilitate your acquiring ownership of the Georgetown Park property, including by assigning ... the Right of First Offer to you or as you direct." If Mr. Lanier acquired the Mall, whether or not by virtue of the ROFO, Mr. Miller, in return, "would be provided" a 7.5% "carried" interest[1] in "an entity formed for the single purpose of acquiring, redeveloping, owning and operating the property."

The 1998 Letter Agreement did not specify how the joint venture would be formed. Likewise, it did not fix a time for performance, or set a date when the agreement would expire. Beyond mentioning the option of assignment, the letter did not define precisely how Mr. Miller was to "cooperate" by exercising his voting rights in order to "facilitate" Mr. Lanier's acquisition of the Property.

EastBanc continued to develop the area surrounding the Mall, but it did not persuade GPA to sell the Mall itself. In mid-November 1998, Mr. Miller wrote to Mr.

---

1. "Carried interest" is a term often used in connection with oil and gas leases. GERRY W. BEYER & KENNETH R. REDDEN, MODERN DICTIONARY FOR THE LEGAL PROFESSION 162 (3d ed.2001). We need not define precisely what it means in this context.

Lanier to "reiterate my intention to try to work with you to acquire this property." Mr. Miller stated in this letter that he had had discussions with GPA, informing them that "I would be working with you in your efforts to acquire the property since we both share an interest in a positive future for Georgetown." Mr. Miller said that he had told GPA that he would "have an open mind" concerning whether GPA should buy back the ROFO or "sell[ ] the property to us." Miller also urged that "[o]ne way or another I would like to realize a value of the right of first offer in the near-term future."

### C. The 2001 Agreement

EastBanc failed to acquire the Mall during the next two years and, starting in January 2001, Mr. Miller and Mr. Lanier considered modifying their approach. Mr. Miller proposed that he receive a cash payment instead of the 7.5% equity interest described in the 1998 Letter Agreement. The parties continued to negotiate along these lines throughout the spring and summer.

In July 2001, Mr. Miller, Mr. Lanier, and EastBanc signed a new agreement (the "2001 Agreement") that changed the method for compensating Mr. Miller. EastBanc agreed to pay Mr. Miller a $3 million waiver fee if it acquired the Mall by May 31, 2002 ("the Outside Closing Date"). In exchange, Mr. Miller promised to exercise (or refrain from exercising) the ROFO to benefit EastBanc and Mr. Lanier, and "otherwise assist Lanier to facilitate the acquisition of the Property by Lanier, Eastbanc[2] or the Lanier Entity." The 2001 Agreement stated that it "modifie[d] only the benefit to which Miller will be entitled for fulfilling his obligations set forth in the [1998] Letter Agreement and in this Agreement by substituting the Waiver Fee" for the previously promised equity interest. "The Parties agree[d] that the modification to the [1998] Letter Agreement set forth in this Agreement will terminate as of the Outside Closing Date."

The 2001 Agreement memorialized serious disagreements about what would happen if EastBanc was not able to close on the Mall by May 31, 2002. "Miller maintain[ed] that the Letter Agreement has expired in accordance with its terms and is no longer of any force and effect." On the other hand, the "Lanier Parties maintain[ed] that the Letter Agreement remains in full force and effect and will remain in full force and effect after the Outside Closing Date." Apparently agreeing to disagree, the parties stated that they "do not desire by the terms of this Agreement to either extend or cut short the term of the Letter Agreement or prejudice in any manner the arguments of either party thereto."

Mr. Lanier considered some of these statements by Mr. Miller to be mere posturing to improve his leverage when negotiating for an amendment to the 1998 Letter Agreement.[3] Despite continued efforts to acquire the Property before May 31, 2002, EastBanc and GPA II were not able to do so, and the 2001 Agreement expired according to its terms.

### D. Events in 2006

Early in 2006, GPA decided to sell the Mall, and its broker sent a prospectus to potential buyers. EastBanc submitted an offer, but GPA rejected it, indicating that

---

**2.** Documents often refer to EastBanc as "Eastbanc."

**3.** On May 25, 2001, after receiving notice in accordance with the ROFO, Mr. Miller wrote

to GPA declining to purchase the Property on the terms offered. It is not clear from the record whether Mr. Lanier knew about the May 2001 letter.

it had accepted another bid. At that point, EastBanc believed that the only way it could acquire the Property would be by calling upon GPA II to exercise its ROFO rights.

GPA II did not exercise its ROFO rights in favor of EastBanc, however. In a letter to Mr. Lanier dated March 1, 2006, Mr. Miller asserted that in 1998 and 2001, EastBanc and GPA II "discussed the possibility that GPA II would not exercise its ROFO in order to facilitate your making an offer to purchase [the Mall], but we did not reach a definitive agreement on terms." Mr. Miller advised that GPA II was "considering exercising the ROFO for [its] own account and benefit in order to purchase the Georgetown Park property." Mr. Miller concluded by asserting that "GPA II remains at liberty to exercise its ROFO rights for its own benefit."

EastBanc responded on March 17, 2006, asking for confirmation that GPA II would "honor its obligations to EastBanc" under the 1998 Letter Agreement and requesting that GPA II execute "an appropriate instrument" assigning its rights under the ROFO to EastBanc. GPA II did not do so by the date requested, and on March 23, 2006, EastBanc filed a complaint against GPA II and Mr. Miller, alleging breach of the 1998 Letter Agreement and requesting specific performance and declaratory relief.

### E. Superior Court Proceedings

GPA II moved for summary judgment, which the Superior Court granted, determining that the controversy rested "solely on the legal construction of a chain of correspondence between Anthony Lanier and Herbert Miller...."

GPA II asserted that the three-year statute of limitations barred EastBanc's claim because it accrued prior to March 23, 2003. The trial court agreed, considering "Eastbanc's claim to have arisen with the execution of the 2001 Agreement...." That agreement "unequivocally communicated [GPA II's] intent not to cooperate further with Eastbanc to acquire the Property after [May 31, 2002]."

EastBanc argued that the 2001 Agreement was at most a repudiation of the 1998 Letter Agreement, and that it could elect to treat the repudiation as a breach and sue immediately or it could await performance under the contract, which it chose to do. The court rejected this argument, reasoning that because the "1998 Agreement does not fix a time for performance, there exists no date for the court to determine when the performance was due, and hence when the claim accrued. Therefore, in the absence of any workable alternative, the court rule[d] that Eastbanc's claim accrued when it signed the 2001 Agreement on July 20, 2001...." Thus, the trial court concluded, EastBanc's claim was time-barred. The court denied EastBanc's pending motion to amend the complaint.

EastBanc subsequently moved to alter or amend the judgment. Denying that motion, the court articulated slightly different reasoning: "By signing the 2001 Agreement, GPA II repudiated any obligations it may have had under the 1998 Agreement. Eastbanc also signed the 2001 Agreement, signifying that it accepted GPA [II]'s repudiation, i.e., treated it as a breach of the 1998 Agreement." This appeal followed.

### II. Standard of Review

"In reviewing a trial court's grant of summary judgment, we make an independent review of the record and employ the same standards as does the trial court in initially considering the motion. We therefore must determine whether the party awarded summary judgment demonstrated that there is no genuine issue of material fact and that it is entitled to

judgment as a matter of law. We view the record in the light most favorable to the non-moving party." *National Association of Postmasters of the United States v. Hyatt Regency Washington,* 894 A.2d 471, 474 (D.C.2006); *see LaPrade v. Rosinsky,* 882 A.2d 192, 196 (D.C.2005) (affirming trial court's grant of summary judgment because claim was filed after expiration of three-year limitation period for breach of contract actions).

### III. The 1998 Letter Agreement Was a Contract

■ EastBanc argues that the 1998 Letter Agreement constitutes an enforceable contract between the parties while GPA II insists it was merely an unenforceable "agreement to agree." " 'The determination whether an enforceable contract exists, when based on the contract documents, is a question of law....' " *Kramer Associates v. Ikam, Ltd.,* 888 A.2d 247, 251 (D.C.2005) (citing *Rosenthal v. National Produce Co.,* 573 A.2d 365, 369 n. 9 (D.C. 1990)). Thus, although the Superior Court did not reach this question, we may address it on appeal. We choose to do so because it is a logical preliminary step before addressing breach of contract claims and because the parties have fully briefed and argued the issue. EastBanc has the burden of establishing that a contract exists. *See Jack Baker, Inc. v. Office Space Development Corp.,* 664 A.2d 1236, 1238 (D.C.1995) ("[T]he party asserting the existence of a contract has the burden of proof on that issue.").

■ For a contract to be enforceable, "there must be '(1) an agreement to all material terms, and (2) intention of the parties to be bound.' " *Duffy v. Duffy,* 881 A.2d 630, 634 (D.C.2005) (quoting *Jack Baker,* 664 A.2d at 1238). In addition, mutuality of obligation must exist. *Order of AHEPA v. Travel Consultants, Inc.,* 367 A.2d 119, 125 (D.C.1976). "A contract must be sufficiently definite as to its mate-

rial terms (which include, *e.g.,* subject matter, price, payment terms, quantity, quality, and duration) that the promises and performance to be rendered by each party are reasonably certain." *Rosenthal,* 573 A.2d at 370 (citing J.D. CALAMARI & J.M. PERILLO, THE LAW OF CONTRACTS, § 2–13, at 43–44 & n. 17 (2d ed.1977)). However, " '[a]ll the terms contemplated by the agreement need not be fixed with complete and perfect certainty for a contract to [be enforceable].' " *Rosenthal,* 573 A.2d at 370 (quoting *V'Soske v. Barwick,* 404 F.2d 495, 500 (2d Cir.1968)). "All agreements have some degree of indefiniteness and some degree of uncertainty." *Id.* A contract is enforceable if it is "sufficiently definite so that the parties can be reasonably certain as to how they are to perform." *Duffy,* 881 A.2d at 638. Moreover, "the terms of the contract [must be] clear enough for the court to determine whether a breach has occurred and to identify an appropriate remedy...." *Affordable Elegance Travel, Inc. v. Worldspan, L.P.,* 774 A.2d 320, 327 (D.C.2001).

#### A. Intent of the Parties to be Bound

■ When he wrote the letter which became the 1998 Letter Agreement, Mr. Miller stated that his purpose was to "confirm the agreement" the parties had reached a day earlier. The body of the letter stated several obligations that each party agreed to assume. At the end, Miller requested: "If this letter accurately expresses our agreement, I would appreciate your signing and returning the enclosed copy of this letter." Lanier countersigned the letter under the acknowledgment "[s]een and agreed." This document demonstrates the intent of the parties to be bound.

#### B. Agreement as to All Material Terms

■ The respective obligations of the parties were clear enough that each could

be reasonably certain how it was to perform. *See Duffy*, 881 A.2d at 638. Mr. Miller promised to cooperate with East-Banc by "exercising [his] voting rights with respect to the Right of First Offer in a manner that would facilitate [Mr. Lanier's] acquiring ownership of the Georgetown Park property...." The Agreement did not delimit how Mr. Miller would exercise those voting rights, but it stated that one option would be to assign the ROFO to EastBanc. In return, EastBanc was to provide Mr. Miller a 7.5% carried interest "in an entity formed for the single purpose of acquiring, redeveloping, owning and operating the property." When read in context, these terms are sufficiently clear to determine whether a breach occurred.

██ GPA II nevertheless asserts that the 1998 Letter Agreement is merely an agreement to agree during later negotiations, and that GPA II's "mere abstract promise to 'cooperate'" is insufficiently definite. We disagree. The enforceability of the agreement comes from the definitive character of the *obligation* to perform, not a precise description of the ways in which the obligation might be fulfilled. *See Hackney v. Morelite Construction*, 418 A.2d 1062, 1068–69 (D.C.1980) (" '[T]he mere fact that a contract, definite in material respects, contains some terms which are subject to further negotiation ... will not bar a decree for specific performance.' " (quoting *Ammerman v. City Stores Co.*, 129 U.S.App. D.C. 325, 330, 394 F.2d 950, 955 (1968))); RESTATEMENT (SECOND) OF CONTRACTS, § 34 (1981) ("The terms of a contract may be reasonably certain even though it empowers one or both parties to make a selection of terms in the course of performance."). Mr. Miller's promise is not simply an agreement to agree at a later date; rather, it is a concrete and express promise to help East-Banc acquire the Mall through exercise of the ROFO.

██ GPA II also argues that the letter—which refers one time to a joint venture—cannot be a binding agreement because it does not sufficiently flesh out the structure of that joint venture. This argument overlooks the desire for flexibility in the 1998 Letter Agreement. As the Court of Appeals of New York has explained:

> The difficulty is that the concept of definiteness cannot be reduced to a precise, universal measurement. The standard is necessarily flexible, varying for example with the subject of the agreement, its complexity, the purpose for which the contract was made, the circumstances under which it was made, and the relation of the parties.

*Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*, 74 N.Y.2d 475, 548 N.Y.S.2d 920, 548 N.E.2d 203, 206 (1989) (noting that "a price term is not necessarily indefinite because the agreement ... leaves fixing the amount for the future") (internal citations omitted); *see also Kenai v. Ferguson*, 732 P.2d 184, 187 (Alaska 1987) (holding contract enforceable although parties could not reach agreement on amount of future payments, where rent was subject to renegotiation every five years, but fifty-five-year term of the lease was "the essence of the contract"). This was an emerging situation and details would be worked out if EastBanc acquired the Mall. The specifics of any future joint venture were not central to the agreement to cooperate in acquiring the Property.

## C. Mutuality of Obligation

██ For a contract to be enforceable, each party must undertake to "do something [the] party otherwise is under no legal obligation to do, or to refrain from doing something [the] party has a legal right to do...." *Order of AHEPA*, 367 A.2d at 125. An exchange of promises provides sufficient consideration, evidencing mutual obligation. *See Rinck v. Asso-*

ciation of Reserve City Bankers, 676 A.2d 12, 16 (D.C.1996). In the 1998 Letter Agreement, GPA II promised to exercise the ROFO "in a manner that would facilitate" EastBanc's acquisition of the Mall. In return, EastBanc promised to provide GPA II with a 7.5% carried interest in some future entity that would control the newly acquired Mall. Each party undertook to do something it would otherwise have no legal obligation to do.

 GPA II argues that there was no mutuality of obligation because nothing in the agreement obligated EastBanc to make any effort to acquire the Property. This argument fails to account for the primary obligation undertaken by East-Banc—to give Mr. Miller a percentage interest "in an entity formed for the single purpose of acquiring, redeveloping, owning and operating the property." This court has recognized that "joint adventurers" have special duties and obligations to each other "within the scope of the enterprise and with respect to the subject matter of the joint venture." Sind v. Pollin, 356 A.2d 653, 655 (D.C.1976). "The duty imposed is essentially one of good faith, [and] fair and open dealing . . . ." Id. (quoting Libby v. L.J. Corp., 101 U.S.App. D.C. 87, 90, 247 F.2d 78, 81 (1957)). Under these circumstances, the duty of good faith and fair dealing required EastBanc to make reasonable, good faith efforts to purchase the Property. Indeed, it cannot fairly be doubted that EastBanc assumed this obligation. The primary impetus for the 1998 Letter Agreement was EastBanc's keen interest in acquiring the Mall.

In sum, we conclude that the parties expressed an intent to be bound, agreed to all material terms, and assumed mutual obligations sufficient to create an enforceable contract. We do not foreclose further litigation about whether the parties intended their contract to include a reasonable time limit that expired before March of

2006. See In re McCagg, 450 A.2d 414, 416–17 (D.C.1982).

## IV. General Principles for Accrual of Claim

The parties agree that EastBanc's claims are subject to the three-year statute of limitations applicable to breach of contract actions under D.C.Code § 12–301(7) (2001). They disagree, however, as to whether the period of limitations had expired before EastBanc filed its complaint.

 "A cause of action for breach of contract accrues, and the statute of limitations begins to run, at the time of the breach . . . ." 1 CALVIN W. CORMAN, LIMITATION OF ACTIONS, § 7.2.1, at 482 (1991); accord, Bembery v. District of Columbia, 758 A.2d 518, 520 (D.C.2000) ("[I]n an action for breach of a contract or lease the statute of limitations runs from the time of the breach."). A contract is breached if a party fails to perform when performance is due. 9 ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 943 (interim ed.2002). Under modern contract principles, an aggrieved party also may be entitled to sue prior to breach if the other party has anticipatorily repudiated the contract. See, e.g., Roehm v. Horst, 178 U.S. 1, 13, 20 S.Ct. 780, 44 L.Ed. 953 (1900); 23 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 63:32 (4th ed.1993). "The aggrieved party is entitled to sue either when the anticipatory repudiation occurs or at the later time for performance under the contract. The time of accrual consequently depends on whether the injured party chooses to treat the anticipatory repudiation as a present breach." 1 CORMAN, § 7.2.1, at 488. In essence, this rule gives the plaintiff an option—sue now (if the contract has been repudiated in anticipation of nonperformance) or sue later (at the time of nonperformance).

The forcefulness of a repudiation does not transform it into a breach. Rather, the force and clarity of the repudiation affects whether the non-repudiating party is entitled to bring suit before an actual breach occurs—whether the repudiating party's words and conduct sufficiently manifest an intention not to perform when it is required to do so. "Anticipatory repudiation is not something to be lightly inferred in the rugged give-and-take of the marketplace." *Reiman v. International Hospitality Group, Ltd.,* 614 A.2d 925, 929 (D.C.1992); *see* 9 CORBIN § 973; 23 WILLISTON & LORD § 63:45 ("It is invariably stated in the decisions that in order to give rise to an anticipatory breach of contract, the defendant's refusal to perform must have been positive and unconditional."). "For a repudiation of a contract by one party to be sufficient to give the other party the right to recover for breach, the repudiating party must have communicated, by word or conduct, unequivocally and positively its intention not to perform." *Order of AHEPA,* 367 A.2d at 125.

Even if the repudiation is clear, forceful, and unequivocal, the time for filing suit does not begin to run on the strength of the anticipatory repudiation alone. *See* 1 CORMAN, § 7.2.1, at 488. In *Franconia Associates v. United States,* 536 U.S. 129, 143, 122 S.Ct. 1993, 153 L.Ed.2d 132 (2002), for example, the United States Supreme Court held that the passage of a statute which eliminated borrowers' contractual rights to prepay certain loans constituted a repudiation, not a breach, even though the Act of Congress was a clear and unequivocal communication of the federal government's intent not to perform upon request. It is hard to imagine a more definitive manifestation of an intent not to perform than legislation passed by two Houses of Congress and signed by the President, yet the Court held there was only repudiation, based upon which the plaintiffs could *elect* to sue; plaintiffs also could choose to wait for nonperformance. *Id.* at 144, 122 S.Ct. 1993.

GPA II argues that the "accrual rule"—that the plaintiff may disregard a repudiation and wait until performance is due—applies only to contracts which fix a time for performance. However, it fails to cite any controlling source that confirms its interpretation of the rule. For example, GPA II relies upon a sentence from *Franconia* in which the Court stated that "if the injured party instead opts to await performance, 'the cause of action accrues, and the statute of limitations commences to run, *from the time fixed for performance* rather than from the earlier date of repudiation.'" 536 U.S. at 144, 122 S.Ct. 1993 (emphasis added) (citing 1 CORMAN § 7.2.1, at 488).

GPA II places too much weight on negative implications drawn from the italicized language, which is merely a reference to the principle that a contract is breached if a party fails to perform when performance is due. More importantly, GPA II disregards the actual holding of *Franconia*—that the statute of limitations would begin to run when the government "wrongly rejected tender of prepayment. . . ." 536 U.S. at 149, 122 S.Ct. 1993. In other words, a "breach would occur when a borrower attempted to prepay, for only at that time would the Government's responsive performance become due." *Id.* at 143, 122 S.Ct. 1993. The time for performance by the government was hardly "fixed." By its very nature, a "prepayment" occurs before payment is due. Moreover, that day would arrive only "if and when, at some point in the future, petitioners attempted to prepay their mortgages." *Id.* Thus, in *Franconia,* the Supreme Court applied the accrual rule to a contract that did not fix the time for performance.

Similarly, the other cases cited by GPA II do not endorse the rule it espouses. We likewise have failed to uncover any

authoritative statement of a principle that would exempt from the accrual rule contracts which do not specify a date for performance. Nor are we persuaded by GPA II's argument that applying the accrual rule to a contract like this one would mean that EastBanc could wait forever to bring a claim for breach of the 1998 Letter Agreement. We have already held that the terms of that agreement are sufficiently clear that the parties can determine how (and therefore when) they are to perform. Moreover, a signatory to a contract who feels plagued by prolonged uncertainty could ask the court to infer "from explicit provisions, or from the circumstances surrounding the formation of the agreement" that the parties intended their contract to include a reasonable time limit. *See In re McCagg*, 450 A.2d at 417.[4]

## V. Application of the Accrual Rule to this Case

■■■ The trial court held in its initial order that GPA II repudiated the 1998 Letter Agreement by executing the 2001 Agreement—"the court consider[ed] GPA II to have unequivocally communicated its intent not to further cooperate with Eastbanc to acquire the Property after the Outside Closing Date." Furthermore, the court concluded that the statute of limitations began to run at that time. In its order denying the motion to alter or amend judgment, the court clarified that "[b]y signing the 2001 Agreement, GPA II repudiated any obligations it may have had under the 1998 Agreement." "Eastbanc also signed the 2001 Agreement, signifying that it accepted GPA [II]'s repudiation, *i.e.*, treated it as a breach of the 1998 Agreement." We hold that the trial court erred under both theories.

As we have explained, for purposes of applying the statute of limitations, there is a crucial difference between repudiating a contract and breaching it. Yet, the trial court mistakenly treated a repudiation as if it were a breach. GPA II defends this ruling by asserting, in the alternative, that this was no run-of-the-mill repudiation. Even if a repudiation does not normally start the running of the statute of limitations, it argues, EastBanc's complaint is time-barred because GPA II "totally repudiated" the contract when it "unequivocally [made] clear that it will *never* perform the contract." Once again, GPA II fails to cite any controlling or persuasive authority to support its argument.

To be sure, in *Fowler v. A & A Co.*, 262 A.2d 344 (D.C.1970), we *said*, in rather cryptic dictum, that "[u]pon total repudiation of the contract one no longer has the election of continuing the contract but must timely enforce his rights through available legal remedies." *Id.* at 348 n. 6.[5]

4. In *McCagg*, a case involving a bailment and a claim that the owners of property had waited too long to demand its return, "we decline[d] to adopt a rule that a limited time for making demand must be imposed regardless of the parties' intent." 450 A.2d at 417 (relying on *Nyhus v. Travel Management Corp.*, 151 U.S.App. D.C. 269, 282, 466 F.2d 440, 453 (1972)).

5. Read in context, this sentence does not support GPA II's argument. As the opinion in *Fowler* reveals, there had been an actual breach of the contract, not merely a repudiation of it. 262 A.2d at 347. Moreover, the authorities cited in the *Fowler* footnote do not support GPA II. On the page cited from *Bu-Vi-Bar Petroleum Corp. v. Krow*, 40 F.2d 488 (10th Cir.1930), the court states:

When defendant repudiated the contract, plaintiffs had an election of remedies as follows: (a) To rescind the contract and recover the value of any performance rendered. (b) To treat the repudiation as an immediate breach and sue at once for any damages which plaintiffs had sustained. (c) To treat the contract as binding and wait until the time for its performance and thereafter bring an action on the contract for its breach.

*See id.* at 490; *see also* 17 Am.Jur. 2d *Contracts* § 444 (1964) ("Ordinarily, where a contract is

However, we *held* that "the trial court did not err in ruling that the statute began to run from the date O'Roark breached the contract by failing to correct the defect on demand...." *Id.* at 347. *See Ehrenhaft v. Malcolm Price, Inc.,* 483 A.2d 1192, 1203 n. 17 (D.C.1984) (*Fowler* held "that the statute of limitations begins to run from the date that a contractor breaches the contract by failing to correct a defect upon demand"). Moreover, the decision in *Colwell v. Eising,* 118 Wash.2d 861, 827 P.2d 1005 (1992) (en banc), relied upon by GPA II, *says* that the "[d]efendant's total repudiation was the event which caused accrual [of the cause of action]," *id.* at 1010, but the opinion explains that the defendant had refused after demand to share compensation with his partners. *Id.* at 1007. The court noted that the plaintiffs had provided "evidence of the complete repudiation *and breach*" of the partnership agreement. *Id.* at 1009 (emphasis added).

Similarly, in *Minidoka Irrigation District v. Department of Interior,* 406 F.3d 567 (9th Cir.2005), the court explained: "This case involving active breach by nonperformance, coupled with the district court's finding of unequivocal repudiation, is readily distinguishable from *Franconia* where there was only anticipatory repudiation...." *Id.* at 574; *see id.* at 573 ("the government's repudiation here was not merely anticipatory, rather it was a total repudiation accompanied by the government's breach of its obligation to provide MID with annual accountings and credits based on revenues from the Minidoka Project"). We express no views on whether *Colwell* and *Minidoka* were correctly decided, but they most assuredly do not support the argument that a "total repudiation" not accompanied by an actual breach starts the running of the statute of limitations.[6]

■ As we have discussed, the force and clarity of a repudiation does not transform it into a breach. The same is true when a repudiation is "total." When GPA II repudiated its obligation under the 1998 Letter Agreement, EastBanc was entitled to elect whether to sue immediately or to wait until a breach occurred. "A so-called anticipatory breach only becomes a wrongful act if the promisee elects to treat it as

wholly renounced, there can be no real election between continuation and cessation of performance, because, after notice of renunciation, the other party cannot go on and complete an executory contract and recover any increased damages resulting from his continuing to perform.)" (citing *Bu–Vi–Bar Petroleum* ); LAURENCE P. SIMPSON, HANDBOOK OF THE LAW OF CONTRACTS § 187, at 378–79 (2d ed. 1965) ("*Present* repudiation of a contract is a total breach. Repudiation is present rather than anticipatory if made when or after performance is due.... Plaintiff not only may, but must, treat the contract at an end so far as his own performance is concerned and substitute his remedial rights.... [A]n *anticipatory* repudiation *may* be treated by the promisee as a total breach ...." (emphasis added)).

6. *Colwell* is best explained as applying the principle applicable to "continuing contracts" that "repudiation following partial breach by non-performance is to be treated as a total breach and not as an 'anticipatory breach'...." RESTATEMENT (SECOND) OF CONTRACTS § 253, reporter's note to cmt. a (1981) (quoted in *Colwell,* 827 P.2d at 1009 n. 4). Likewise, *Minidoka* involved a contract that created continuing obligations. 406 F.3d at 572. *Minidoka* cites 4 A. CORBIN, CORBIN ON CONTRACTS, § 989 (1951), for the proposition that "where there is 'actual present breach ... accompanied by definite repudiation ... according to the weight of authority there is a total breach by the repudiator, creating in the injured party a single right of action.'" *Minidoka,* 406 F.3d at 573. *Cf. Keefe Co. v. Americable International, Inc.,* 755 A.2d 469, 475 (D.C.2000) ("Where a contract involves future installment obligations, it seems logically to follow that repudiation of the contract in its entirety would require a clear anticipatory breach of all future obligations in addition to any present breach.").

such." *Sheffield v. Paul T. Stone, Inc.*, 68 App. D.C. 378, 380, 98 F.2d 250, 252 (1938) (quoted in *Keefe Co. v. Americable International, Inc.*, 755 A.2d 469, 473 (D.C. 2000)). One method of manifesting such an election is to file an action for breach of contract. 23 WILLISTON & LORD § 63:55, at 666.

The Superior Court treated EastBanc's signature on the 2001 Agreement as manifesting such an election because "it was in that writing that GPA II repudiated the 1998 Agreement," and "Eastbanc's signature on the 2001 Agreement demonstrates that it knew that Miller's position as of that date was that the 1998 Agreement was no longer of any effect." Moreover, "as a sophisticated businessman with able legal counsel, Lanier could have easily taken appropriate legal action long before" this action was filed. This analysis erroneously equates knowledge of a repudiation with an election to treat it as a breach. It also confuses what Mr. Lanier could have done with what he was obliged to do.

We do not construe EastBanc's signing of the 2001 Agreement as an election to treat the repudiation as a breach of contract. (Nor do we accept GPA II's argument that the January 28, 2001, email foreshadowing the 2001 Agreement or EastBanc's performance under that agreement manifest such an election.) The essence of the 2001 Agreement is that it allowed the parties to work toward acquisition of the Property while agreeing to disagree about the force and effect of the 1998 Letter Agreement. The document expressly states their understanding that when the 2001 Agreement expired on its own terms in May 2002, they would resume their respective postures. East-Banc would continue to argue that the 1998 Letter Agreement was an enforceable contract, still in effect, and GPA II would argue the contrary. EastBanc's signature on the 2001 Agreement did not

signify an election to treat the new agreement as a breach of the old one.

In sum, we hold that the trial court erred in ruling that the statute of limitations began to run when the parties signed the 2001 Agreement in July 2001. Narrowing the issues which must be addressed on remand, we also hold that the 1998 Letter Agreement constitutes an enforceable contract.

## VI. Questions About the Statute of Limitations to Be Addressed on Remand

This opinion will not resolve all outstanding issues concerning the statute of limitations. For example, GPA II reiterates additional arguments that it made to the trial court, asserting that, on other occasions from 1998 to 2001, it did not merely repudiate the 1998 Letter Agreement but actually breached it. First, GPA II states that in November 1998, it was "openly attempting to *sell* the ROFO to GPA." Second, GPA II asserts that in January 2001 it "expressly refused to proceed under the terms of the 1998 Letter." Finally, GPA II and Miller argue that on May 25, 2001, they "*unilaterally* evaluated and rejected GPA's offer [to sell the Property to GPA II]—expressly stating they owned the ROFO and that their rejection of GPA's offer could not 'be construed as a waiver of the [ROFO].' " See note 3, *supra*. Each of these alleged breaches, GPA II argues, started the running of the statute of limitations more than three years before the complaint was filed.

The trial court did not reach these questions, and we decline to address them for the first time on appeal. The Superior Court granted the motion for summary judgment before discovery was conducted, and we do not know enough about the surrounding facts to determine whether any of these events might have triggered

the statute of limitations. Thus, we return these issues to the trial court for consideration.

## VII. Amendment of the Complaint

Before the trial court granted GPA II's motion for summary judgment, EastBanc moved to amend its complaint under Super. Ct. Civ. R. 15(a). The amended complaint would have added both a claim for breach of fiduciary duty and another defendant—Georgetown Park Associates ("GPA"), the record owner of the Property. The Superior Court denied leave to amend, seemingly linking that decision to its previous conclusion that the complaint was time-barred. At oral argument, EastBanc conceded that nothing in the proffered amended complaint would have affected the trial court's statute of limitations analysis.

Because we are reversing its ruling on the statute of limitations issue, the trial court should reconsider EastBanc's motion for leave to amend its complaint. *See generally Sherman v. Adoption Center of Washington, Inc.,* 741 A.2d 1031, 1038 (D.C.1999) (factors to consider in ruling on a motion for leave to amend). We were informed at oral argument that the Mall has been sold, so it is likely that EastBanc will proffer a new amended complaint to take account of intervening events.

## VIII. Conclusion

For the reasons stated, we reverse and remand for further proceedings consistent with this opinion.

*So ordered.*