Chief Judge KOZINSKI,
dissenting in large part: *
As the majority belatedly acknowledges more than halfway into its opinion, we don’t come to this case with a blank slate. A prior panel has already held in a published opinion that Proposition 200 isn’t preempted because the National Voter Registration Act (“NVRA”) “plainly allow[s] states, at least to some extent, to *1199 require their citizens to present evidence of citizenship when registering to vote.” Gonzalez v. Arizona, 485 F.3d 1041, 1050-51 (9th Cir.2007) (“Gonzalez I ”). That is law of the circuit and therefore binding on us. See, e.g., Miller v. Gammie, 335 F.3d 889, 899-900 (9th Cir.2003) (en banc). Even if it weren’t, it’s law of the case and can’t be lightly disregarded for that reason. See, e.g., Merritt v. Mackey, 932 F.2d 1317, 1322 (9th Cir.1991). The majority refuses to accept the consequences of this reality. First, it evades law of the circuit by creating an exception that is squarely foreclosed by a recent unanimous en banc opinion. The majority then weakens our rules governing law of the case by declaring that Gonzalez I’s interpretation of the NVRA is “clearly erroneous” when it’s clearly not. Because I believe that we must take precedent seriously and that Gonzalez I was correctly decided, I dissent from the majority’s conclusion that the NVRA preempts Arizona’s voter registration requirement.
I.
The fundamental rule of circuit law is that once a panel decides a legal issue in a published opinion, that ruling binds subsequent three-judge panels. The only instance when a three-judge panel may depart from a prior published opinion is if there has been “intervening” higher authority that is “clearly irreconcilable with our prior circuit authority.” Miller, 335 F.3d at 900. And this instance is not truly an exception to the rule because it’s the intervening higher authority, not the three-judge panel, that overrules the earlier opinion. There are in fact no exceptions to law of the circuit, or at least there weren’t until today.
The majority holds that, although a published opinion is binding generally, it doesn’t bind later panels in the same case. For those panels, “[wjhere no subsequent opinion has relied on the prior published opinion for the proposition to be overturned, ... the law of the circuit doctrine does not prohibit revising the prior opinion.” Maj. at 1190.
This exception to the published opinion rule is irreconcilable with our recent en banc opinion in United States v. Washington, 593 F.3d 790 (9th Cir.2010) (en banc) (“Washington IV”). In that case, the three-judge panel was confronted with a conflict between a prior opinion in the same case and another panel’s opinion in a different case. Because it lacked the power to resolve the conflict, the three-judge panel had to call the case en banc sua sponte. Sitting en banc, we held:
This appeal was initially argued to a three-judge panel, but the conflict in our precedent led us to rehear the matter en banc without awaiting a three-judge decision. See Atonio v. Wards Cove Packing Co., 810 F.2d 1477, 1478-79 (9th Cir.1987) (en banc). This step was necessary because, even if the panel could have revisited Washington III under one of the exceptions to law of the case, see Jeffries v. Wood, 114 F.3d 1484, 1489 (9th Cir.1997) (en banc), it still would have been bound by that published opinion as the law of the circuit, see, e.g., Old Person v. Brown, 312 F.3d 1036, 1039 (9th Cir.2002) (“[W]e have no discretion to depart from precedential aspects of our prior decision in Old Person I, under the general law-of-the-cireuit rule.”).
Washington IV, 593 F.3d at 798 n. 9.
Applying the Washington IV rule to this case is simple. “[EJven if” our three-judge panel were permitted to revisit the prior panel’s opinion “under one of the exceptions to law of the case,” we are “still ... bound by that published opinion as the law of the circuit ” and have “no discretion to depart from [it].” Id. (emphasis added). Washington IV — which clearly holds that law of the circuit trumps law of the case— forecloses the majority’s theory.
*1200 The majority brushes aside Washington TV, relying instead on three earlier cases, foremost Jeffries v. Wood, 114 F.3d 1484 (9th Cir.1997) (en banc) (“Jeffries V”). There are two problems with the majority’s reliance on Jeffries V, both of which are fatal to the majority’s new rule. First, Jeffries V was about law of the case, not law of the circuit. Jeffries V held that the three-judge panel in Jeffries TV erred by failing to follow Jeffries III, and based this conclusion on law of the case. 114 F.3d at 1492-93. The majority makes much of the fact that the dissent in Jeffries V would have resolved the case on law of the circuit grounds. Maj. at 1189-90. But it is peculiar indeed to impute a holding to the majority on an issue it never addressed, because it chose not to follow the contrary reasoning of the dissent. A dissent has no precedential value, United States v. Ameline, 409 F.3d 1073, 1083 n. 5 (9th Cir. 2005) (en banc), and the majority is surely not obligated to address every argument made there. It is obviously dangerous to infer that the majority ruled on a matter as to which it never expressed an opinion. By that peculiar reasoning, a majority can be held to have decided an issue — and made it law of the circuit — when it never said a word on the subject.
The Jeffries V majority had very little to say about law of the circuit, and what it did say totally undermines the majority here: “The dissent seems to acknowledge that [the] law of the circuit doctrine would preclude the Jeffries IV panel from contradicting the Jeffries III opinion, thus reaching the same result as the majority.” Id. at 1493 n. 12. The majority somehow manages to squeeze blood from a turnip.
Second, to the extent Washington IV says something different from Jeffries V, it is the most recent en banc opinion and therefore clearly controls. See United States v. Heredia, 483 F.3d 913, 918-19 (9th Cir.2007) (en banc) (recognizing that a later en banc court may overrule an earlier en banc opinion). The majority objects that Washington IV couldn’t have overruled the “longstanding doctrine” that a three-judge panel may overturn a prior panel’s published opinion under an exception to the law of the case, Maj. at 1190, but the doctrine in fact never existed until today. It has no support in Jeffries V or any other published opinion in our circuit.
Take the other two cases the majority cites. See Maj. at 1188 (citing Mendenhall v. NTSB, 213 F.3d 464, 469(9th Cir.2000) (“Mendenhall II”); Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg’l Planning Agency, 216 F.3d 764, 786-87 (9th Cir. 2000) (“Tahoe IV”)). The majority claims these cases support its new rule because both reversed “a prior published appellate opinion as clearly erroneous under the exceptions to the law of the case” doctrine. Maj. at 1188. But neither case contradicted the prior panel’s legal ruling and therefore never disturbed the law of the circuit. See United States v. Johnson, 256 F.3d 895, 916 (9th Cir.2001) (en banc) (Kozinski, J., concurring) (a legal statement isn’t law of the circuit unless “it is clear that a majority of the panel has focused on the legal issue presented by the case before it and made a deliberate decision to resolve the issue”).[1]
*1201 The later Mendenhall panel reversed an award of market-rate attorney’s fees, Mendenhall II, 213 F.3d at 469 & n. 3, but didn’t overturn the prior panel’s statement that “a request [for] attorneys’ fees at a reasonable market rate____is appropriate where there is a showing of bad faith,” Mendenhall v. NTSB, 92 F.3d 871, 876 (9th Cir.1996). Rather, it realized that the prior panel had mistakenly applied a statute awarding attorney’s fees to litigants who prevailed in court to someone who had prevailed in an administrative proceeding. Mendenhall II, 213 F.3d at 469. Because the later panel applied the correct statute, it had no occasion to disturb the prior panel’s construction of the other statute.
In Tahoe, both the earlier panel and the later panel applied the rule that, in general, defendants must affirmatively plead the statute of limitations in a filing with the court. See Levald, Inc. v. City of Palm Desert, 998 F.2d 680, 686-87 (9th Cir. 1993). The prior panel had held that the plaintiffs’ claims weren’t time-barred because, by “[flailing to plead affirmatively” any statute of limitations other than an irrelevant one, the defendants couldn’t then “rely on any other.” Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg’l Planning Agency, 34 F.3d 753, 756 (9th Cir. 1994) (“Tahoe III ”). On remand, the defendants filed an answer that pled the correct statute of limitations, and the later panel held that the claims were therefore time-barred. Tahoe IV, 216 F.3d at 788-89. Like Mendenhall, the later panel’s putative reversal of a prior panel didn’t alter a binding statement of circuit law.[2]
Nor are Mendenhall and Tahoe the only cases on point. A number of panel opinions hold that law of the circuit applies to later panels in the same case. Old Person v. Brown, 312 F.3d 1036, 1039 (9th Cir. 2002), which Washington IV quotes, is a good example. The Old Person panel explained that it was bound by a prior opinion because “none of the three exceptions” to law of the case applied, but it was careful to point out that it also had “no discretion to depart from precedential aspects of our prior decision in Old Person I, under the general law of the circuit rule.” Id.; see also Minidoka Irrigation Dist. v. Dep’t of Interior, 406 F.3d 567, 574 (9th Cir.2005) (“[W]e are ‘bound by the opinion of the prior panel as the law of the case. Also we have no discretion to depart from precedential aspects of our prior decision in [Minidoka I ], under the general law-of-the circuit rule.’ ” (second alteration in original)); accord Hilao v. Estate of Marcos, 103 F.3d 767, 772 (9th Cir.1996) (“This court has twice rejected these arguments in Estate I and Estate II. The published decisions in those cases are both the controlling law of the circuit and the law of this case.” (citations omitted)).
*1202 Like Washington IV, these opinions explain that three-judge panels are bound by prior panel opinions as law of the circuit even if they’re not bound by those decisions as law of the case. They also reconcile Mendenhall II and Tahoe TV with our law of the circuit rule, for neither of those cases departed from “precedential aspects” of the prior panel opinions. But even if Mendenhall and Tahoe stood for what the majority claims, our three-judge panel doesn’t have the power to elevate them above Old Person, Minidoka or Hilao. If “faced with such a conflict,” we “must call for en banc review, which the court will normally grant unless the prior decisions can be distinguished.” Atonio, 810 F.2d at 1479 (emphasis added).[3]
Ultimately, this is all academic. There’s just no getting around Washington IV’s holding that “even if’ we were permitted to revisit the prior panel’s opinion “under one of the exceptions to law of the case,” we are “still ... bound by that published opinion as the law of the circuit” and have “no discretion to depart from [it].” 593 F.3d at 798 n. 9. We can debate the meaning of Jeffries all we want, but a unanimous en banc court in Washington IV just resolved this very issue against the majority’s position. The majority here audaciously contradicts this en banc opinion.[4]
*1203 II.
Even if the majority were right that law of the circuit doesn’t apply, Gonzalez I undisputedly binds us as law of the case. The majority tries in vain to wriggle out from under Gonzalez I’s conclusion that the NVRA doesn’t preempt Proposition 200 by invoking the “clearly erroneous” exception to the law of the case. Maj. at 1187-89. But the clearly erroneous bar is a tall one to hurdle: If “it is plausible to find that” the NVRA doesn’t preempt Proposition 200, “the holding in [Gonzalez I] cannot be deemed clearly erroneous.” Leslie Salt Co. v. United States, 55 F.3d 1388, 1394(9th Cir.1995). “[I]t is incumbent upon [plaintiffs] to convince us not only that the majority decision in [Gonzalez I ] was wrong, but that it was clearly wrong.” Merritt, 932 F.2d at 1322; see also Jeffries V, 114 F.3d at 1489. The majority fails to carry this heavy burden and materially weakens the standard for all future cases by pretending that it does.
A.
According to the majority, the Gonzalez I panel’s “conclusion was rooted in a fundamental misreading of the statute.” Maj. at 1187 (emphasis added). “Reasoning from a fundamental misreading of the statute, the prior panel reached a conclusion that was clear error.” Id. at 1188 (emphasis added). But we don’t examine prior panels’ reasoning. We must follow Gonzalez I unless the “decision ... is so clearly incorrect that we are justified in refusing to regard it as law of the case.” Merritt, 932 F.2d at 1321 (emphasis altered); see Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 817, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988) (“[T]he law of the case turns on whether a court previously ‘decide[d] upon a rule of law’ ... not on whether, or how well, it explained the decision.” (second alteration in original)).
We might “scrutinize the merits ... with greater care” if Gonzalez I lacked any “analysis reflecting the authorities or argument which led [it] to the rule [it reached].” United States v. Houser, 804 F.2d 565, 568 (9th Cir.1986). But the law of the case doctrine doesn’t allow us to assume that poor reasoning begets clear error. Indeed, we’ve held that a panel’s failure to “expressly address [a] claim in its opinion” — and corresponding failure to offer any reasons for its resolution of that claim — isn’t clearly erroneous. Leslie Salt, 55 F.3d at 1393.
A panel’s faulty reasoning doesn’t necessarily consign its conclusion to the trash heap; most conclusions can be arrived at through multiple chains of reasoning. And, although “panels will occasionally find it appropriate to offer alternative rationales,” Johnson, 256 F.3d at 914 (emphasis added), they’re not required to do so. Thus, the existence of perceived holes in a prior panel’s stated rationale doesn’t preclude the possibility that the panel had unstated reasons leading it to the same conclusion. It certainly doesn’t mean that the result the panel reached is incorrect, as it may have reached the correct result for the wrong reason.[5] When we say that *1204 a panel’s holding is clearly wrong, what we’re talking about is the rule of law it announces, not the method by which it adopts that rule.[6]
This distinction doesn’t matter here because Gonzalez I wasn’t clearly erroneous in either reasoning or result. Let’s start with Gonzalez I’s statement that “[t]he NVRA mandates that states either ‘accept and use the mail voter registration form prescribed by the [Election Assistance Commission,]’ or, in the alternative, ‘develop and use [their own] form,’ as long as the latter conforms to the federal guidelines.” Gonzalez I, 485 F.3d at 1050 (third alteration in original) (citations omitted). The majority takes issue with this passage because the NVRA requires states to accept and use both the federal and state forms; ergo, Gonzalez I misconstrued the statute. Maj. at 1187. But “the word ‘or’ is often used as a careless substitute for the word ‘and’; that is, it is often used in phrases where ‘and’ would express the thought with greater clarity.” De Sylva v. Ballentine, 351 U.S. 570, 573, 76 S.Ct. 974, 100 L.Ed. 1415 (1956). Indeed, it is well recognized that “or” can have multiple meanings, with the “exclusive or” — meaning one or the other but not both — being largely useful in symbolic logic rather than common parlance. Wikipedia, Exclusive or, http://en.wikipedia.org/wiki/Exclusive_ or (last visited Aug. 21, 2010).[7]
Legislatures' — -which presumably choose statutory language with care — have used “or” conjunctively instead of as a disjunctive, exclusive “or.” See, e.g., Chemehuevi Tribe of Indians v. Fed. Power Comm’n, 420 U.S. 395, 417-18, 95 S.Ct. 1066, 43 L.Ed.2d 279 (1975) (“utilizing the surplus water or water power”); Swearingen v. United States, 161 U.S. 446, 450, 16 S.Ct. 562, 40 L.Ed. 765 (1896) (“obscene, lewd or lascivious”); see also Steven Wisotsky, How To Interpret Statutes — Or Not: *1205 Plain Meaning and Other Phantoms, 10 J.App. Prac. & Process 321, 326-27 (2009). And phrases that seem obviously disjunctive like “or, in the alternative” are sometimes used conjunctively. See H.W. Fowler, A Dictionary of Modem English Usage 147 (2d ed.1965). Thus, the Gonzalez I panel could have meant that a state may rely exclusively on the federal form or, in the alternative, also develop a state form.[8] This is a perfectly accurate description of the NVRA.
The majority protests that Gonzalez I couldn’t have used “or” conjunctively because “such an interpretation would be contrary to the prior panel’s logic.” Maj. at 1188. But it’s only contrary to the majority’s interpretation of the prior panel’s logic — and the majority begins its interpretation by assuming Gonzalez I misread the statute. This is known as begging the question. If we begin with the presumption that unanimous three-judge panels don’t misread statutes, the “or” can easily be construed conjunctively, to support the conclusion that Gonzalez I interpreted the NVRA correctly. Cf. United States v. Brown, 459 F.3d 509, 525 (5th Cir.2006) (“[I]f we begin with the assumption that[the defendant] is guilty, the documents can be read to support that assumption. But if we begin with the proper presumption that [he] is not guilty ..., we must conclude the evidence is insufficient....”).
The other two quotes to which the majority points support its argument even less. Gonzalez I states that section 1973gg-7(b) of the NVRA “prohibits states from requiring that [their] form be notarized or otherwise formally authenticated,” and “permits states to ‘require[ ] such identifying information ... as is necessary to enable ... election officials] to assess the eligibility of the applicant.’ ” 485 F.3d at 1050 (alterations in original). The majority argues that Gonzalez I “misread” the statute because the “portions of the NVRA that relate to the Federal Form ... are directed solely at the [Election Assistance Commission], not the states.” Maj. at 1187. But these instructions to the Commission do apply to the states through section 1973gg-4(a)(2), which allows states to “develop and use” their own form if it “meets all of the criteria stated in section 1973gg-7(b).” Gonzalez I reads the statute correctly; it is the majority here that is mistaken.
B.
Even if the majority’s reasoning is wrong, its conclusion that Gonzalez I clearly erred could still be correct if the NVRA must be read to preempt state law. But it’s not enough for the majority to find a construction of the statute it likes better. After all, many statutes can plausibly be construed two different ways, neither of which can be said to be clearly wrong. See, e.g., Chevron, U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (“[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency’s answer is based on a permissible construction of the statute.” (emphasis added)). To be clearly erroneous, the prior panel’s construction must be so flawed that it could not pass the second step of the Chevron test, had that construction been adopted by an ad *1206 ministrative agency. See id. at 844, 104 S.Ct. 2778 (“[A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.” (emphasis added)).
In this case, the text of the NVRA doesn’t “directly address! ] the precise question at issue,” id. at 843, 104 S.Ct. 2778, namely whether states can ask for supplemental proof of citizenship. The statute says that “[e]aeh State shall accept and use the mail voter registration application form prescribed by the [Election Assistance Commission].” 42 U.S.C. § 1973gg-4(a)(l). It likewise requires “[a]eceptance of completed voter registration application forms” at state and local government offices, which must be transmitted “to the appropriate State election official.” 42 U.S.C. § 1973gg-5(a)(4)(iii). The statute doesn’t obviously prohibit supplemental state requirements, and both preemptive and non-preemptive constructions of “accept” and “use” are plausible. The prior panel’s construction thus easily passes the Chevron test.
The majority believes that, by requiring states to “accept and use” the federal form “for the registration of voters in elections for Federal office,” 42 U.S.C. § 1973gg-4(a)(1), the NVRA precludes states from imposing additional requirements. Maj. at 1182,1188. But neither “accept” nor “use” has such a preclusive meaning; it’s entirely possible to accept and use something for a particular purpose, yet not have it be sufficient to satisfy that purpose. Just go to any liquor store that takes personal checks: They will happily accept and use your check, but only after you provide ID showing that you’re authorized to write it. A minute’s thought comes up with endless such examples: passport and visa; car registration and proof of insurance; boarding pass and picture ID; eggs and ham. Those who accept and use the former often also require the latter.
The majority’s contention that “accept and use” must be read preclusively “[i]n the context of the NVRA,” or “under an Elections Clause framework,” Maj. at 1188, is unconvincing because its understanding of “use” conflicts with that word’s plain English meaning. As the Supreme Court has observed,
Webster’s defines “to use” as “[t]o convert to one’s service” or “to employ.” Webster’s New International Dictionary 2806 (2d ed.1950). Black’s Law Dictionary contains a similar definition: “[t]o make use of; to convert to one’s service; to employ; to avail oneself of; to utilize; to carry out a purpose or action by means of.” Black’s Law Dictionary 1541 (6th ed.1990). Indeed, over 100 years ago we gave the word “use” the same gloss, indicating that it means “ ‘to employ’” or “‘to derive service from.’” Astor v. Merritt, 111 U.S. 202, 213, 4 S.Ct. 413, 28 L.Ed. 401 (1884).
Smith v. United States, 508 U.S. 223, 228-29, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993) (alterations in original). To “use” an object is simply to derive service from or utilize it. The NVRA doesn’t say that states must treat the federal form as a complete application. It might preclude a state from requiring an applicant to provide yet again the information that is already on the federal form, but that’s not the case here. There’s no question that Arizona accepts and uses the federal form for the information contained in it. Arizona only asks for proof of citizenship in addition to the form in order to complete the registration process.
Nor is the “accept and use” requirement necessarily converted into a broad preemption provision by the NVRA’s general statement that “notwithstanding any other Federal or State law, in addition to any *1207 other method of voter registration provided for under State law, each State shall establish procedures to register to vote in elections for Federal office.” 42 U.S.C. § 1973gg-2(a); see Maj. at 1178. That provision merely requires states to implement the NVRA regardless of any contrary legal authority. It doesn’t alter the substantive scope of the statute.
The only thing the NVRA expressly prohibits states from requiring is “notarization or other formal authentication.” 42 U.S.C. § 1973gg-7(b)(3). The inclusion of a specific prohibition is a strong indication that other prohibitions weren’t intended. See United States v. Cabaccang, 332 F.3d 622, 630 (9th Cir.2003); see also U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779, 793 n.9, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995).
Moreover, the NVRA expressly authorizes states to require “such identifying information ... as is necessary to enable the appropriate State election official to assess the eligibility of the applicant.” 42 U.S.C. § 1973gg-7(b)(l). This provision can plausibly be read as authorizing the type of “identifying information” that Arizona requires. The majority holds that this passage is part of a comprehensive framework preventing states from requiring proof of citizenship, but overlooks the possibility that such proof may be “necessary to enable” Arizona to assess eligibility. See Maj. at 1181.
Other states also require supplemental information and the current National Voter Registration Form available on the Election Assistance Commission website, http://www.eac.gov, (“Registration Form”) seamlessly accommodates them. The current form includes a box labeled “ID Number” that directs applicants to “[s]ee item 6 in the instructions for your state.” Item 6, in turn, catalogs the state-by-state requirements each applicant must satisfy before the state will “accept and use” the federal form. Just like Arizona, many states require applicants to include proof of eligibility. In Alabama, “[yjour social security number is requested.” Registration Form at 3. Connecticut requires a “Connecticut Driver’s License Number, or if none, the last four digits of your Social Security Number.” Id. at 5. Hawaii tells applicants that “[yjour full social security number is required. It is used to prevent fraudulent registration and voting. Failure to furnish this information will prevent acceptance of this application.” Id. at 7. There’s more, but you get the idea. The majority’s reading of the NVRA casts doubt on the voter registration procedures of many states in addition to Arizona.
The simple truth is that nothing in the NVRA clearly supersedes Arizona’s supplemental registration requirements. To get its way, the majority invents a broad rule of same-subject-matter preemption, arguing that the NVRA “addresses precisely the same topic as Proposition 200 in greater specificity, namely, the information that will be required to ensure that an applicant is eligible to vote in federal elections,” such that its “comprehensive regulation” of the voter registration procedure “clearly subsumes Proposition 200’s additional documentary requirement.” Maj. at 1181. But, as the majority acknowledges earlier in its opinion, the question under the Elections Clause isn’t whether the two laws address “the same topic,” but whether Arizona’s law “complements” rather than conflicts with “the congressional procedural scheme.” Maj. at 1176 (citing Ex parte Siebold, 100 U.S. 371, 384, 25 L.Ed. 717 (1879)); see also Foster v. Love, 522 U.S. 67, 74, 118 S.Ct. 464, 139 L.Ed.2d 369 (1997) (state’s election law is preempted “to [thej extent [that] it conflicts with federal law”). There’s no conflict based on the text of the statutes. Arizona gladly accepts and uses the federal form, it just *1208 asks that voters also provide some proof of citizenship.
Had Congress meant to enact a comprehensive code of voter registration, it could have said so in the NVRA, but it didn’t. Congress may have had the more modest goal of balancing ease of registration against each state’s interest in protecting its voting system. Had Congress explicitly prohibited states from imposing additional requirements, then we could plausibly conclude that Gonzalez I is clearly wrong. But it didn’t, and therefore the majority has no authority under the law of the case doctrine to “depart from [the] prior decision.” Jeffries V, 114 F.3d at 1493.
C.
The majority offers several of its own reasons for why the NVRA preempts Arizona’s law. “If this court were considering the issue for the first time, [these] arguments might well deserve closer consideration.” Leslie Salt, 55 F.3d at 1395. But “at this point in the proceedings, [we] may address the merits of [the] claims only so far as necessary to determine whether the [Gonzalez I] court was clearly wrong.” Id. at 1394. None of the majority’s reasons meet this exacting standard.
1. The majority claims that “allowing states to impose their own requirements for federal voter registration ... would nullify the NVRA’s procedure for soliciting state input, and aggrandize the states’ role in direct contravention of the lines of authority prescribed by Section 7.” Maj. at 1182. But Congress never granted much authority to the Election Assistance Commission. The Commission can’t write many regulations, 42 U.S.C. § 15329, can’t enforce the NVRA or the regulations it writes, id. § 1973gg-9, and has no investigative powers. That’s not the profile of an agency in charge of a comprehensive regulatory scheme. Cf. CFTC v. Schor, 478 U.S. 833, 842, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986) (O’Connor, J.) (“Congress empowered the CFTC ‘to make and promulgate such rules and regulations as ... are reasonably necessary to effectuate any of the provisions or to accomplish any of the purposes of [the CEA].’” (alteration in original)). And Section 7 of the NVRA doesn’t even prescribe lines of authority; it orders the Commission to consult with the states when developing the federal form. See id. § 1973gg-7(a). If anything, this indicates that Congress didn’t want to aggrandize the Commission’s power over the states. It certainly doesn’t “demonstrate a legislative intent to limit States to a purely advisory role.” Cal. Coastal Comm’n v. Granite Rock Co., 480 U.S. 572, 584, 107 S.Ct. 1419, 94 L.Ed.2d 577 (1987) (O’Connor, J.); see also Block v. Cmty. Nutrition Inst., 467 U.S. 340, 347, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984) (O’Connor, J.).
Nor is the majority right to rely on the letter from the Election Assistance Commission telling Arizona that its proof-of-citizenship requirement violates the NVRA. Maj. at 1182. We don’t give deference to administrative agencies on the question of preemption. See Wyeth v. Levine, -U.S.-, 129 S.Ct. 1187, 1200-01, 173 L.Ed.2d 51 (2009) (“In such cases, the Court has performed its own conflict determination, relying on the substance of state and federal law and not on agency proclamations of pre-emption.”). Even if we did, we wouldn’t defer in this case, because an informal letter clearly lacks “the force of law.” United States v. Mead Corp., 533 U.S. 218, 226-27,121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). Determining whether the NVRA preempts Arizona’s proof-of-citizenship requirement begins and ends with the statute.
For the same reason, the majority’s claims that states shouldn’t be able to *1209 make an “end-run around the[Election Assistance Commission's consultative process,” Maj. at 1182, and that allowing states to supplement the federal form “would make the [Commission’s] procedure for consultation ... an empty exercise,” id. at 1188, beg the question of whether the Commission can bind the states. Congress may have intended to grant states the power to supplement federal rules despite the Commission’s objection. Cf. Cuomo v. Clearing House Ass’n, - U.S. -, 129 S.Ct. 2710, 2717, 174 L.Ed.2d 464 (2009) (states can enforce state fair-lending laws that OCC tried to preempt). If Congress intended to give states this power to disagree, then Arizona hasn’t made an end-run at all.
2. The majority relies on the fact that the NVRA “addresses precisely the same topic as Proposition 200 in greater specificity, namely, the information that will be required to ensure that an applicant is eligible to vote in federal elections.” Maj. at 1181. But the NVRA’s text never states that it’s the exclusive authority on this issue, or that the federal form must be “a fully sufficient means of registering to vote in federal elections.” Maj. at 1188. It’s perfectly plausible that the NVRA would have set the minimum information states must require, prohibited one specific type of requirement (formal authentication) and established a consultative process for developing a national form. Such broad, flexible guidance is far from a definitive regulatory scheme. Moreover, if the statute permits zero deviation from the federal form, why permit states to develop their own forms at all? The only development needed would be photocopying the federal form.
Relatedly, the majority claims that because the NVRA prohibits requiring “notarization or other formal authentication,” 42 U.S.C. § 1973gg-7(b)(3), Congress must have intended to prohibit states from imposing any supplemental requirements. Maj. at 1182. But Congress doesn’t disguise general proscriptions of everything as specific proscriptions of one narrow thing. See Whitman v. Am. Trucking Ass’n, 531 U.S. 457, 468, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001) (“Congress ... [doesn’t] hide elephants in mouse-holes.”). Nor would permitting Arizona to require proof of citizenship free it to violate the NVRA’s ban on requiring formal notarization. Maj. at 1181. Refusing to enforce an unwritten ban hardly weakens the force of an express prohibition.
3. The majority devotes much time to making the case that “the thrust of the NVRA is to increase federal voter registration by streamlining the registration process.” Maj. at 1180; see id. at 1176-80. It spends endless pages reviewing the history of voting laws, id. at 1176-78, discussing congressional hearings on the general problem of voter participation, id. at 1177, and reviewing the many operative parts of the NVRA, Maj. at 1178-80. But the majority’s lengthy disquisition on history and purpose only highlights the absence of any textual support for its conclusion that Congress meant to increase voter registration by prohibiting state-imposed supplemental requirements. To the extent we rely on purpose at all, we should focus on the purposes codified in the statute rather than our guesses based on reading the tea leaves of history and context. See Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 568, 125 S.Ct. 2611, 162 L.Ed.2d 502 (2005).
The NVRA’s four purposes are:
(1) to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office;
(2) to make it possible for Federal, State, and local governments to implement this subchapter in a manner that *1210 enhances the participation of eligible citizens as voters in elections for Federal office;
(3) to protect the integrity of the electoral process; and
(4) to ensure that accurate and current voter registration rolls are maintained.
42 U.S.C. § 1973gg(b) (emphasis added). Congress thus told us that it was concerned with maximizing the registration of “eligible” voters, in addition “to protecting] the integrity of the electoral process” and “ensuring] that accurate and current voter registration rolls are maintained.” Id. None of these purposes is served when individuals who are not citizens register to vote. See John v. United States, 247 F.3d 1032, 1036-37 (9th Cir. 2001) (“We must not ‘interpret federal statutes to negate their own stated purposes.’ ”). The majority never explains why a statute enacted to “protect the integrity of the electoral process” and “ensure” that voter rolls are “accurate” must preclude states from confirming that those who wish to register are, in fact, eligible to vote.
* * *
The majority distorts two major areas of law before it even reaches the merits. It creates an unprecedented exception to our law of the circuit rule, trampling underfoot a newly minted en banc opinion. The majority also makes a mess of the law of the case analysis by taking issue with a prior panel’s reasoning, not its conclusion. And, as to the merits, the panel comes nowhere close to proving that Gonzalez I’s interpretation of the National Voter Registration Act was wrong, much less clearly wrong. Few panels are able to upset quite so many apple carts all at once. Count me out.

 I concur in the portion of the judgment upholding Proposition 200's polling place provision, Ariz.Rev.Stat. § 16-579. For the reasons articulated by the district court in its thorough decision, I would affirm its ruling in favor of Arizona on the equal protection and Voting Rights Act challenges to Proposition 200’s voter registration requirement.

. While the majority ignores Johnson when exaggerating the precedential effect of two cases that didn’t alter the law of the circuit, it relies on the Johnson concurrence in an attempt to characterize Washington TV's rule as the sort of ’'casual[]” statement "uttered in passing” that isn’t binding on later panels. Maj. at 1190-91. But the statement in Washington TV was necessary to explain why the three-judge panel had to make a sua sponte en banc call. 593 F.3d at 798 n. 9. In any event, statements in en banc opinions, as in Supreme Court opinions, must be taken far more seriously than statements in three-judge *1201 panel opinions, even if they are not strictly necessary to the result. See United States v. Baird, 85 F.3d 450, 453 (9th Cir.1996) ("[W]e treat Supreme Court dicta with due deference ...."). That's because, like Washington TV’s rule, a statement in an en banc opinion that’s not necessary to resolve the merits of the case often "provides a supervisory function” to "three-judge panels and district courts---- [and] thus constitutes authoritative circuit law.” Barapind v. Enomoto, 400 F.3d 744, 751 n. 8 (9th Cir.2005) (en banc); see, e.g., Miller, 335 F.3d at 900; United States v. Hardesty, 977 F.2d 1347, 1348 (9th Cir.1992) (en banc) (per curiam); Atonio v. Wards Cove Packing Co., 810 F.2d 1477, 1478-79 (9th Cir. 1987) (en banc).

. Tahoe TV said that it overturned Tahoe Ill’s “bare legal holding ... that the defendants forfeited the correct statute of limitations defense.” Tahoe TV, 216 F.3d at 788. If that were truly Tahoe Ill's holding, then the subsequent panel would have overturned law of the circuit. But it wasn't. Tahoe III said only that the defendants couldn't rely on a statute of limitations they hadn't pled. Because the defendants hadn’t filed their answer, Tahoe III couldn’t have considered whether they waived their statute of limitations defense.

. We’re not alone. Most of our sister circuits agree that three-judge panels must follow pri- or published opinions in the same case as law of the circuit. See, e.g., Schiavo ex rel. Schindler v. Schiavo, 403 F.3d 1289, 1292 (11th Cir.2005) ("Because our previous decision was published, the prior panel precedent rule also applies to any holdings reached in the earlier appeal.”); Swipies v. Kofka, 419 F.3d 709, 714 (8th Cir.2005) (”[W]e held in an earlier appeal in this case that Mr. Swipies possessed such an interest. We are bound to follow this holding. It is not only the law of the case, but the law of the circuit, i.e., a decision of another panel which only the court en banc may overturn.” (citations omitted)); Af-Cap Inc. v. Republic of Congo, 383 F.3d 361, 367 n. 6 (5th Cir.2004) ("The subsequent panel would not only have to forego application of the law of the case doctrine, but would also have to discard the well-established rule that circuit panels are ‘bound by the precedent of previous panels absent an intervening ... case explicitly or implicitly overruling that prior precedent.' ” (alteration in original)); United States v. Alow, 327 F.3d 1217, 1220 (D.C.Cir.2003) ("[Tjhose issues are barred by law of the case doctrine.... In addition, the law of the circuit doctrine applicable here prevents a new appellate panel from declining to follow the legal rulings of the panel in a prior appeal.”); Craft v. United States, 233 F.3d 358, 369 (6th Cir.2000) ("Our decisions in Craft I and in Cole are also law of the circuit. As we recently stated, ‘One panel of this court may not overturn the decision of another panel of this court — that may only be accomplished through an en banc consideration of the argument.’ ”), overruled on other grounds 535 U.S. 274, 122 S.Ct. 1414, 152 L.Ed.2d 437 (2002); Irving v. United States, 162 F.3d 154, 160 (1st Cir.1998) (en banc) ("In [Irving v. United States] (Irving I), [909 F.2d 589 (1st Cir.1990) ] a panel of this court expressly defined the contours of the discretionary function exception. From then on, that methodology represented both the law of the case and the law of this circuit regarding the due application of the discretionary function exception.... Indeed, when the United States asserted the discretionary function defense in [Irving v. United States] (living II), [49 F.3d 830 (1st Cir.1995)] the panel ... took refuge in the law of the circuit doctrine to dispense the argument....” (citation omitted)); Pearson v. Edgar, 153 F.3d 397, 402 (7th Cir.1998) ("Absent any intervening Supreme Court decisions, Curtis and South-Suburban would be binding precedent on this issue, and Curtis would also be the law of the case.”). Such a lopsided verdict from our peers provides yet another reason to question the wisdom of departing from our circuit’s well-settled published opinion rule.

. To the extent the majority suggests a three-judge panel can overrule published opinions because they're "clearly erroneous,” it also conflicts with United States v. Contreras, 593 F.3d 1135 (9th Cir.2010) (en banc). Contreras reversed the portion of a panel opinion that had purported to overrule several clearly erroneous published opinions because the panel lacked authority to do so — even though *1203 the en banc court then adopted the panel's legal analysis. Id. at 1136; cf. State Oil Co. v. Khan, 522 U.S. 3, 20, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997) (court of appeals was correct not to overrule an "infirm[]” Supreme Court decision that it rightly predicted would be overturned by the Supreme Court).

. This principle also informs our review of district court judgments. “In the review of judicial proceedings the rule is settled that, if the decision below is correct, it must be affirmed, although the lower court relied upon a wrong ground or gave a wrong reason.” Thos. P. Gonzalez Corp. v. Consejo Nacional de Produccion de Costa Rica, 614 F.2d 1247, 1256 (9th Cir.1980).

. Focusing on a panel's reasoning defeats the fundamental purpose of law of the case doctrine — protecting the court and the parties from the burden of repeated argument by pertinacious litigants — by encouraging the parties to relitigate their case. See 18B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4478 at 667 (2d ed.2002). Such relitigation can slow decisionmaking to a glacial pace, which is what happened to administrative agencies when judges began to allow litigants to challenge the reasons the agencies gave for the new regulations they proposed. See, e.g., Thomas O. McGarity, Some Thoughts on “Deossifying” the Rulemaking Process, 41 Duke L.J. 1385, 1385-86, 1400-03 (1992); M. Elizabeth Magill, Agency Choice of Policymaking Form, 71 U. Chi. L.Rev. 1383, 1390-91 & n.17 (2004).

. Wikipedia gives the following example to illustrate the difference between the exclusive and the inclusive "or":
[I]t might be argued that the normal intention of a statement like "You may have coffee, or you may have tea" is to stipulate that exactly one of the conditions can be true. Certainly under many circumstances a sentence like this example should be taken as forbidding the possibility of one’s accepting both options. Even so, there is good reason to suppose that this sort of sentence is not disjunctive at all. If all we know about some disjunction is that it is true overall, we cannot be sure that either of its disjuncts is true. For example, if a woman has been told that her friend is either at the snack bar or on the tennis court, she cannot validly infer that he is on the tennis court. But if her waiter tells her that she may have coffee or she may have tea, she can validly infer that she may have tea. Nothing classically thought of as a disjunction has this property. This is so even given that she might reasonably take her waiter as having denied her the possibility of having both coffee and tea.
There are also good general reasons to suppose that no word in any natural language could be adequately represented by the binary exclusive "or” of formal logic.
Wikipedia, Exclusive or, http://en.wikipedia. org/wiki/Exclusive_or (last visited Aug. 21, 2010).

. Our own precedent shows that "and” and "or” can sometimes be used interchangeably. For example, in MacDonald v. Pan American World Airways, Inc., the majority construed "and” in a contract as "or” despite a particularly eloquent dissent. 859 F.2d 742, 744-45 (9th Cir. 1988); see id. at 746 (Kozinski, J., dissenting). MacDonald is law of the circuit as to the "and” versus "or” issue and stands in the way of the majority’s claim that the Gonzalez I panel somehow misread the statute.